**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.* | ) |
| *ex rel.* JOHN R. BORZILLERI, M.D., | ) |
| | ) |
| Plaintiffs, | ) |
| -v.- | )   Civil Action No. |
| | )   14-CV-031-WES-LDA |
| BAYER HEALTHCARE | ) |
| PHARMACEUTICALS, INC., *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**THE UNITED STATES' MOTION TO DISMISS THE COMPLAINT**
**PURSUANT TO SECTION 3730(c)(2)(A) OF THE FALSE CLAIMS ACT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................1

PROCEDURAL HISTORY .............................................................................................2

BASIS FOR THE GOVERNMENT'S INVOCATION OF 3730(c)(2)(A) ............................3

ARGUMENT ..................................................................................................................4

I.      THE FALSE CLAIMS ACT AND THE GOVERNMENT'S
STATUTORY DISMISSAL AUTHORITY ................................................................4

      A.    The Legal Standard For Dismissal Under 31 U.S.C. § 3730(c)(2)(A). .......4

      B.    This Court Should Dismiss Under the *Swift* Standard ...............................6

          1.    The plain language of section 3730(c)(2)(A) is unambiguous
in allowing the Government unfettered discretion to
dismiss *qui tam* actions. ..................................................................6

          2.    The Executive has full discretion to dismiss *qui tam* actions
based upon long-established separation of powers principles. ...........8

          3.    The United States Supreme Court has long recognized
the general unsuitability for judicial review of agency
decisions to refuse enforcement. ....................................................10

      C.    In the Alternative, the Government Satisfies
The Rational-Relation Test of *Sequoia Orange*. .....................................11

          1.    The reasons for the Government's use of its (c)(2)(A)
authority are valid and are rationally served by dismissal ................13

              a.    Ongoing litigation will impose a significant
resource allocation burden on the Government .........................13

              b.    The burden of monitoring these actions cannot
be justified where the United States has determined
that relator's allegations remain unsupported ...........................15

              c.    Relator's actions further lead the Government to
believe that he should not represent what remain
governmental interests in litigation............................................16

CONCLUSION ...............................................................................................................19

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES**</u>

*Bluetarp Financial, Inc. v. Matrix Construction Co., Inc.,*
    709 F.3d 72 (1st Cir. 2013) ........................................................17

*Citizens for Responsibility and Ethics in Washington v. Federal Election Comm'n,*
    892 F.3d 434 (D.C. Cir. 2018) ..................................................... 8

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992)) ...............................................................6, 7

*Ezra Charitable Trust v. Tyco Intern., Ltd.*,
    466 F.3d 1 (1st Cir. 2006) ..........................................................17

*Heckler v. Chaney*,
    470 U.S. 822 (1985) ...............................................................8, 10

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013) ........................................................ 6

*In re Chateaugay Corp.*,
    89 F.3d 942 (2d Cir. 1996) .........................................................6

*Kowalski v. Gagne*,
    914 F.2d 299 (1st Cir. 1990) .......................................................17

*Mendez v. Holder*,
    566 F.3d 316 (2d Cir. 2009) ...................................................... 7-8

*Newman v. United States*,
    382 F.2d 479 (D.C. Cir. 1967) .....................................................8

*Ridenour v. Kaiser-Hill Co., L.L.C.*,
    397 F.3d 925 (10th Cir. 2005) ..................................................5, 11

*Riley v. St. Luke's Episcopal Hosp.*,
    252 F.3d 749 (5th Cir. 2001) ................................................. 4-5, 9

*Russello v. United States*,
    464 U.S. 16 (1983) .................................................................. 8

*Swift v. United States,*
    318 F.3d 250 (D.C. Cir. 2003) ............................................. *passim*

*United States v. Cox*,
    342 F.2d 167 (5th Cir. 1965) ....................................................... 9

*United States v. DiCristina*,
   726 F.3d 92 (2d Cir. 2013) ........................................................................6

*United States ex rel Levine v. Avnet*,
   No. 14-CV-17, 2015 WL 1499519 (E.D. Ky. Apr. 1, 2015) ..................... 7, 12

*United States ex rel. Nasuti v. Savage Farms, Inc.*,
   No. 12-30121-GAO, 2014 WL 1327015 (D. Mass. Mar. 27, 2014) ......... 5, 12

*United States ex rel. Nicholson v. Spigelman*,
   No. 10-cv-3361, 2011 WL 2683161 (N.D. Ill. July 8, 2011) ......... 12

*United States v. Nixon*,
   418 U.S. 683 (1974) ........................................................................8

*United States ex rel. Piacentile v. Amgen Inc.*,
   No. 04 CV 3983, 2013 WL 5460640 (E.D.N.Y. Sept. 30, 2013) .................5, 7

*United States ex rel. Spey v. CVS Caremark Corp.*,
   875 F.3d 746 (3d Cir. 2017) .......................................................14

*United States v. Ron Pair Enters., Inc.*,
   489 U.S. 235 (1989) ........................................................................6

*United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
   151 F.3d 1139 (9th Cir. 1998) ...............................................*passim*

*United States ex rel. Sequoia Orange Co. v. Sunland Packing House Co.*,
   912 F. Supp. 1325 (E.D. Cal. 1995) ........................................ 5

*United States ex rel. Stovall v. Webster Univ.*,
   No. 3:15-cv-03530, 2018 WL 3756888 (D.S.C. Aug. 8, 2018) .........................12

*United States ex rel. Touhy v. Ragen*,
   340 U.S. 462 (1951) ......................................................................10

## **STATUTES**

31 U.S.C. § 3729 ...........................................................................................1

31 U.S.C. § 3730(c)(2)(A) ............................................................... *passim*

42 U.S.C. § 1395w-11(b) ...........................................................................13

**REGULATIONS**

42 C.F.R. § 423.265 .................................................................................................13, 14

42 C.F.R. § 423.279 ....................................................................................................14

42 C.F.R. § 423.293 ....................................................................................................14

42 C.F.R. § 423.505 ....................................................................................................14

**RULES**

Federal Rule of Civil Procedure 12 ..............................................................................1

**OFFICE OF LEGAL COUNSEL OPINIONS**

8 Op. O.L.C. 101 (1984) ...............................................................................................9

## PRELIMINARY STATEMENT

In accordance with 31 U.S.C. § 3730(c)(2)(A), the United States respectfully moves this Court for an order dismissing this action, filed under the *qui tam* provisions of the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733.  The FCA authorizes a private party, known as a "relator," to bring suit on behalf of the United States to recover damages suffered solely by the United States Government as a result of fraud or false claims submitted to it.  31 U.S.C. § 3730(b)(1).  Because of the unique nature of the FCA, however, Congress included several protections in the statute to ensure that the United States retains substantial control over *qui tam* lawsuits filed on its behalf. Among these protections is the right of the United States to "dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion."  31 U.S.C. § 3730(c)(2)(A).[1]  For the reasons that follow, the United States has now determined that it is appropriate to exercise its statutory authority under Section 3730(c)(2)(A) to dismiss this action over Relator's objection, and it asks the Court to order such dismissal.[2]

As discussed below, the First Circuit has not yet spoken on the question of what showing the Government must make when it invokes its statutory authority under this provision of the FCA, and a split as to the applicable standard exists among its sister Circuits.  *Compare Swift v. United States,* 318 F.3d 250, 252 (D.C. Cir. 2003) (holding that the United States has an "unfettered right"

---

[1] Because this motion is not a response to the complaint such as a filing under Rule 12, there is no set timetable for the government to file a Section 3730(c)(2)(A) motion.  Cognizant of the fact that the parties are presently engaged in briefing on 12(b)(6) motions filed by Defendants, in the interest of efficiency and judicial economy, the Government believes it appropriate to file its motion at this time, in conjunction with a parallel motion filed in the Southern District of New York, as discussed below.

[2] The Government notes that this action is also brought on behalf of twenty-seven states and the District of Columbia, pursuant to the *qui tam* provisions of their respective False Claims Acts.  Having conferred with representatives of the State and District Plaintiffs, the United States is advised that they consent to dismissal of this action, without prejudice as to the states.

1

to dismiss a *qui tam* action) *with United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998) (holding that the United States must identify a "valid government purpose" that is rationally related to dismissal).   The Government respectfully suggests that the more recent *Swift* standard better comports with the FCA's statutory text and framework, as well as with well-established principles of deference to the Government's exercise of prosecutorial discretion, and that it provides the proper measure for consideration of this motion. Even if the Court concludes that the United States must provide a rational basis for dismissal, however, that basis exists here for the reasons discussed below, and dismissal is therefore appropriate under either rubric.

## PROCEDURAL HISTORY

Relator John Borzilleri filed this FCA *qui tam* action on January 16, 2014. The following year, while the government's investigation in this case remained ongoing, Relator filed a second *qui tam* action in the Southern District of New York: *United States ex rel Borzilleri v. Abbvie et al*, No. 15 Civ. 7881 (JMF) (S.D.N.Y.).   Both complaints, with factual distinctions that are immaterial for purposes of this motion, raised identical or similar theories of liability, alleging that the various defendant pharmaceutical companies and Pharmacy Benefit Managers ("PBMs") submitted, or caused the submission of, false claims based on, among other allegations, a widespread practice of purportedly charging or collecting kickbacks or payments disguised as so-called *bona fide* or administrative service fees under the Medicare Part D program.   Central to the question of whether this allegation could give rise to FCA liability was a determination of whether the fees in question reflect fair market value for the services provided, whether they were accurately reported to the government, and whether they met several regulatory tests.   *See* Second Amended Complaint, 14-CV-31-WES-LDA ("Amd. Compl."), Docket No. 95. at ¶¶ 27-112.

The United States Attorney's Offices for the District of Rhode Island and the Southern District of New York, in conjunction with the Frauds Section of the Department of Justice's Civil Division in Washington and investigators from multiple federal agencies, diligently investigated Relator's allegations, an investigation that was prolonged both by the complexity of the subject matter, the number of alleged wrongdoers, the Relator's lack of programmatic or insider knowledge,[3] and frequent changes of counsel. The Government ultimately declined to intervene in both this case and the S.D.N.Y. action in March of this year (*See* Docket No. 36), and both cases were then unsealed.

### BASIS FOR THE GOVERNMENT'S INVOCATION OF 3730(c)(2)(A)

Since the declination of these matters, several factors have led the United States to conclude that it should exercise its statutory authority to dismiss these cases.[4] While, as discussed below, the Government respectfully maintains that its decision to dismiss under section 3730(c)(2)(A) is a matter wholly committed to the Department's discretion, three factors, considered both individually and together, animate the decision to invoke that authority at this time. First, the continued litigation of these cases, should they survive Defendants' various motions to dismiss, is likely to require substantial expenditure of government resources by two U.S. Attorneys' offices and the Department of Justice, both to monitor the progress of the cases, and as a third-party participant in discovery. In addition to the need to devote Department resources to these matters, ongoing litigation will tax the federal agency component that oversees the Part D program. With

---

[3] Unlike many whistleblowers, the Relator in this case is not a current or former employee of any defendant, or even someone who works in the healthcare industry. Instead, he has a financial background with a focus on investments in the healthcare field.

[4] Consistent with the Government's determination, the United States is simultaneously seeking dismissal of *United States ex rel Borzilleri v. Abbvie et al*, No. 15 Civ. 7881 (JMF) (S.D.N.Y.) in that court pursuant to its 31 U.S.C. § 3730(c)(2)(A) authority.

a combined sixteen discreet defendants in both actions (five overlap), and a single, relatively small unit within the Centers of Medicare and Medicaid Services ("CMS") possessing much of the requisite expertise and information, this burden is likely to be substantial.    Second, the Government's desire to avoid this burden is heightened where, as here, it has carefully investigated Relator's claims (many of which are rife with hyperbolic exaggeration)[5] and has concluded that many key aspects of his allegations are not supported.    Third and finally, Relator's behavior, including actions since the declination of these cases, convinces the Government that he is not an appropriate advocate of the United States' interests in this action.    This includes his refusal to transfer and consolidate one of these cases with the other, leading to duplicative litigation and a waste of judicial resources, and allegations that he has used the *qui tam* process to leverage his financial interests through securities trading.

## ARGUMENT

### I.    THE FALSE CLAIMS ACT AND THE GOVERNMENT'S STATUTORY DISMISSAL AUTHORITY

#### A.    The Legal Standard For Dismissal Under 31 U.S.C. § 3730(c)(2)(A).

As noted, the First Circuit has not yet construed section 3730(c)(2)(A), and a split in authority exists among its sister Circuits as to what standard applies when the Government seeks to dismiss a *qui tam* case over the objection of the relator.    In *Swift*, the Court of Appeals for the District of Columbia Circuit interpreted Section 3730(c)(2)(A) to grant the Government "an unfettered right to dismiss" a *qui tam* action.    318 F.3d at 252.    The Fifth Circuit, in dicta, has agreed with the D.C. Circuit's formulation of the standard.    *Riley v. St. Luke's Episcopal Hosp.*,

---

[5] For example, the allegation that "[t]his ongoing scheme represents among the most severe corporate violations of the public trust in the history of this nation. Many Americans have lost their lives, have lost access to life-savings [sic] drugs and have faced financial ruin due to this intentional wide-ranging fraud." Amd. Compl., Docket No. 95. at ¶ 23.

4

252 F.3d 749, 753 (5th Cir. 2001) (explaining "the government retains the unilateral power to dismiss an action" under section 3730(c)(2)(A)).   By contrast, in *Sequoia Orange*, the Ninth Circuit applied a "rational relation test" for dismissal, recognizing that the United States has broad prosecutorial discretion to dismiss even meritorious *qui tam* cases so long as the reasons for dismissal are rationally related to a legitimate government interest.  151 F.3d at 1145; *see also Ridenour v. Kaiser-Hill Co., L.L.C.*, 397 F.3d 925, 937 (10th Cir. 2005) (observing that "'it is enough that there are plausible, or arguable, reasons supporting the agency decision [to move for dismissal]'") (quoting *United States ex rel. Sequoia Orange Co. v. Sunland Packing House Co.*, 912 F. Supp. 1325, 1341 (E.D. Cal. 1995)).

Although the First Circuit has not yet adopted a standard for dismissal under section 3730(c)(2)(A), in *United States ex rel. Nasuti v. Savage Farms, Inc.*, No. 12-30121-GAO, 2014 WL 1327015 (D. Mass. Mar. 27, 2014), the United States District Court for the District of Massachusetts expressed support for the *Swift* standard in granting the United States' motion to dismiss a *qui tam* suit, though it declined to formally resolve which standard applied.  *See id.* at *1 ("I find the *Swift* rationale more persuasive."); *aff'd on other grounds*, No. 14-1362, 2015 WL 9598315 (1st Cir. Mar. 12, 2015).  Other courts considering the question in circuits that have not yet decided the issue have made similar findings. *See, e.g. United States ex rel. Piacentile v. Amgen Inc.*, No. 04 CV 3983, 2013 WL 5460640, at *2–3 (E.D.N.Y. Sept. 30, 2013) (granting the Government's motion to dismiss, finding *Swift* "persuasive reasoning." *Id.*).

**B.**     **This Court Should Dismiss Under the *Swift* Standard.**

The United States respectfully submits that *Swift*'s interpretation of Section 3730(c)(2)(A) is correct.   It properly employs the commonly-used tools of statutory interpretation, respects separation-of-powers principles, and is consistent with Supreme Court precedent.

**1.**     ***The plain language of Section 3730(c)(2)(A) is unambiguous in allowing the Government unfettered discretion to dismiss qui tam actions.***

A court begins, as it must, with the text of section 3730(c)(2)(A).  *Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013) ("[I]n interpreting a statute a court should always turn first to one, cardinal cannon before all others," namely that "courts must presume that a legislature says in statute what it means and means in a statute what it says there.") (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)); *United States v. DiCristina*, 726 F.3d 92, 96 (2d Cir. 2013) ("When interpreting a statute, we must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (internal quotations omitted).  So long as "the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry in complete."  *Hedges*, 724 F.3d at 189 (quoting *Germain*, 503 U.S. at 254).  A court's "sole function" at that point "is to enforce [the statute] according to its terms."  *DiCristina*, 726 F.3d at 96 (internal quotations omitted).  Only when the plain language yields an absurd result should courts look beyond the plain language to legislative history.  *In re Chateaugay Corp.*, 89 F.3d 942, 954 (2d Cir. 1996); *see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.") (internal quotations omitted).

Section 3730(c)(2)(A) speaks for itself, by its terms specifying who may dismiss a *qui tam* action:   "The *Government* may dismiss the action notwithstanding the objections of the person

6

initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for hearing on the motion." 31 U.S.C. § 3730(c)(2)(A) (emphasis added).[6]  This language contrasts sharply with language from the very same section, just several provisions below:  "The *court* shall dismiss an action . . . if substantially the same allegations or transactions . . . were publicly disclosed."  31 U.S.C. § 3730(e)(4)(A) (emphasis added).  Because Congress "says in a statute what it means and means in a statute what it says there," *Germain*, 503 U.S. 253–54, this Court must presume Congress meant "The Government"—*i.e.*, the Executive—to have exclusive dismissal authority under section 3730(c)(2)(A).

Likewise, Congress knows how to impose express limits on the Attorney General's authority when it so intends.  The very next paragraph after section 3730(c)(2)(A) states:

> The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action *if the court determines*, after a hearing, that the proposed settlement is fair, adequate, and reasonable . . . .

31 U.SC. § 3730(c)(2)(B) (emphasis added).  Section 3730(c)(2)(B) thus imposes judicial review on the Attorney General's power to settle a *qui tam* action when the relator objects, and specifies the proper standard of that review.  The absence of any such limitation in section 3730(c)(2)(A), and the absence of any standard of review, makes clear that Congress neither intended nor desired judicial review of the Government's decision to dismiss under that authority.  *See Mendez v. Holder*, 566 F.3d 316, 322 (2d Cir. 2009) ("[W]here Congress includes particular language in one

---

[6] As the *Swift* court framed it, the "the function of a hearing [under 3730(c)(2)(A)] when the relator requests one is simply to give the relator a formal opportunity to convince the government not to end the case," *Swift*, 318 F.3d at 253.  *See also Piacentile*, 2013 WL 5460640, at *2 (opportunity to respond to government's motion and appear at oral argument satisfied hearing requirement); *United States ex rel Levine v. Avnet*, No. 14-CV-17, 2015 WL 1499519 *4 (E.D. Ky. Apr. 1, 2015) (opportunity to respond and oral argument sufficient, noting that a more substantive hearing standard could raise constitutional concerns given the discretion conferred on the United States by the statute).

section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Neither the Ninth nor Tenth Circuit identified any absurd result or contrary legislative intention in following the plain language of section 3720(c)(2)(A). Nevertheless, they erroneously turned to legislative history and compounded this error by relying upon statements related to a failed Senate proposal, rather than the bill that was subsequently enacted. Only the D.C. Circuit's interpretation of section 3730(c)(2)(A) properly employs the judicial tools of statutory construction and remains faithful to the cardinal canon that courts follow the plain meaning expressed by Congress.

### 2. *The Executive has full discretion to dismiss qui tam actions based upon long-established separation of power principles.*

The Judicial Branch has long maintained that the Executive's decision against prosecuting a case is unreviewable. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 822, 831 (1985) ("[T]he decision of a prosecutor in the Executive Branch not to indict . . . has long been regarded as the special province of the Executive Branch.") (considering FDA's criminal, civil, and administrative authorities under the Food Drug and Cosmetic Act); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion whether to prosecute a case."); *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings . . . or whether to dismiss a proceeding once brought."); *see also Citizens for Responsibility and Ethics in Washington v. Federal Election Comm'n*, 892 F.3d 434, 438 (D.C. Cir. 2018) (discussing applicability of doctrine to civil enforcement).

It also bears emphasis that the FCA's statutory scheme exists against the backdrop of a constitutionally-based power residing in the Executive alone to pursue litigation for the United States. The Executive derives that power from the Take Care Clause of the United States Constitution. The Attorney General—as "the hand of the President in taking care that the laws of the United States in legal proceedings and in the prosecution of offenses, be faithfully executed"— thus "exercises a discretion as to whether or not there shall be a prosecution in a particular case." *United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965). In light of this framework and well-established separation of powers principles, the imposition of even a rational relation test "deprive[s] the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States" and "is not an accurate statement of constitutional law with respect to the government's judgment not to prosecute." *Swift*, 318 F.3d at 253.[7] *See generally* Prosecution for Contempt of Cong. of an Exec. Branch Official Who Has Asserted a Claim of Exec. Privilege, 8 Op. O.L.C. 101, 124 (1984) (arguing that "the constitutionally prescribed separation of powers requires that the Executive retain discretion with respect to whom it will prosecute for violations of the law" and that "[t]he Executive's exclusive authority to prosecute violations of the law gives rise to the corollary that neither the Judicial nor Legislative Branches may directly interfere with the prosecutorial discretion of the Executive").

---

[7] The fact that a relator has brought suit on behalf of the United States does nothing to limit the Attorney General's authority to dismiss a *qui tam* action. *See, e.g.*, *Riley*, 252 F.3d at 753 ("That a private citizen may pursue a *qui tam* litigation under the FCA . . . does not interfere with the President's constitutionally assigned functions under Article II's Take Care Clause.") (en banc).

**3.**     ***The United States Supreme Court has long recognized the general unsuitability for judicial review of agency decisions to refuse enforcement.***

The Supreme Court "has recognized . . . over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion" and is therefore "presumed immune from judicial review." *Heckler*, 470 U.S. at 831–32.   Justice Rehnquist, writing for the Court, cited many practical reasons—all relevant to the decision of the Attorney General not to prosecute—in acknowledging "the general unsuitability for judicial review of agency decisions to refuse enforcement." *Id*.  To begin with, "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 831.  The agency must not only assess whether a violation has occurred, but whether agency resources are best spent investigating or prosecuting other violations.  *Id.*  An agency must also consider whether it "is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.*

The Department of Justice undertakes a similar analysis in deciding whether to prosecute an FCA action.  Even in instances where the relator conducts the action after the United States declines to intervene, the Government expends resources monitoring and reviewing the pleadings, filing statements of interest, participating in motions or attending mediation, when necessary, and participating as *amicus* on appeal.  Likewise, the affected agency incurs costs responding to *Touhy* requests for documents and testimony.[8]  Additionally, the decision to dismiss a *qui tam* complaint must take into account whether the action is likely to succeed, whether the Department of Justice and the affected agency have available resources, and whether such resources are best spent on

---

[8] *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951).

other matters.  The Department of Justice must also consider whether the particular matter fits the purpose of the FCA and whether the FCA contains a proper remedy for the harm asserted. Because balancing these considerations is within the exclusive province of the Executive, the United States respectfully submits that it exercises absolute discretion in deciding whether to dismiss this *qui tam* action pursuant to section 3730(c)(2)(A), and that the Court should dismiss the case.

### C.   In the Alternative, The Government Satisfies The Rational-Relation Test of *Sequoia Orange*.

Even were the Court to disagree, however, and review the United States' motion to dismiss under the Ninth Circuit's *Sequoia Orange* rational relation test, the Government easily satisfies that standard here.  *Sequoia Orange* requires only that the Government identify "a valid government purpose" and a "rational relation between dismissal and accomplishment of the purpose." *Sequoia Orange*, 151 F.3d at 1145.[9]

In *Sequoia Orange*, the Ninth Circuit affirmed the district court's order granting the Government's motion to dismiss, holding "the government's concern with litigation costs" was a valid government purpose on the ground that "the government can legitimately consider the burden imposed on the taxpayers by its litigation." *Id.* at 1146.  Indeed, the court explicitly noted that "[e]ven if the relators were to litigate the FCA claims, the government would continue to incur enormous internal staff costs." *Id.*  Likewise, the Tenth Circuit held that preserving agency costs and resources were valid government purposes rationally related to dismissal.  *Ridenour*, 397 F.3d at 937.  There, the Tenth Circuit affirmed the district court's order granting the Government's motion to dismiss, finding that litigation would divert federal personnel away from projects

---

[9] In this regard, it bears emphasis that the Ninth and Tenth Circuits, as well as the D.C. Circuit and the United States District Court for the District of Massachusetts, have all held minimizing litigation costs, one of the proffered grounds in this case, to be a valid government purpose supporting dismissal.

supporting the agency's mission and toward projects in aid of litigation, while also "placing an added financial burden" on the agency through a requirement to shift funds from mission efforts to litigation. *Id.* at 937. Even the D.C. Circuit in *Swift* noted that, assuming section 3730(c)(2)(A) authorized judicial review as set forth by the Ninth Circuit, "the government's goal of minimizing its expenses is still a legitimate objective, and dismissal of the suit furthered that objective." *Swift*, 318 F.3d at 354.

As noted above, one court in this Circuit has addressed a Government motion to dismiss pursuant to section 3730(c)(2)(A). While the district court in *Nasuti* found *Swift*'s rationale "more persuasive," the court also opined that, in the alternative, "the [g]overnment's quest to dismiss an action under the *Sequoia* [*Orange*] standard" would not be "particularly arduous." *Nasuti*, 2014 WL 1327015, at *10. In that case, the court concluded that dismissal was appropriate under either *Swift* or *Sequoia Orange* because the government articulated a concern that, "were this case to continue, it would incur substantial costs in monitoring the litigation . . . , responding to discovery requests, and clarifying relator's misstatements of the law." *Id.* at *11. Both *Nasuti* and *Sequoia Orange* accordingly recognized that "litigation costs represent a valid government interest" and the government may therefore rationally seek dismissal of an action even where the allegations may have merit. *Nasuti*, 2014 WL 1327015, at *11 (citing *Sequoia Orange*, 151 F.3d at 1146); *see also United States ex rel. Stovall v. Webster Univ.*, No. 3:15-cv-03530, 2018 WL 3756888, at *3 (D.S.C. Aug. 8, 2018) (granting government's motion to dismiss because "dismissal will further its interest in preserving scarce resources by avoiding the time and expense necessary to monitor this action"); *Avnet*, 2015 WL 1499519, at *5 (same); *United States ex rel. Nicholson v. Spigelman*, No. 10-cv-3361, 2011 WL 2683161, at *2 (N.D. Ill. July 8, 2011) (same). As in *Nasuti* and other cases, dismissal is appropriate here because, as discussed below, it is rationally related to the valid

12

governmental purpose of preserving limited government resources and avoiding the burdens associated with litigation, a concern that is heightened by the issues discussed below.

### 1. The reasons for the Government's use of its (c)(2)(A) authority are valid and are rationally served by dismissal

As noted above, the Government's rationale for dismissal in these cases is threefold: (1) ongoing litigation is likely to burden the United States and require expenditure of resources that could better be applied elsewhere; (2) the Government is particularly disinclined to bear this burden given its conclusion, based on investigation, that Relator's claims are unsupported and unlikely to result in any significant recovery; and (3) Relator's behavior gives the United States' concern that he will not pursue the Government's interests in this case, as distinct from his own.

### a. Ongoing litigation will impose a significant resource allocation burden on the Government.

With respect to the burden imposed via monitoring or participation in discovery, it is worth emphasizing the scope and breadth of Relator's claims. The Medicare Part D program, unlike its predecessor programs Part A (insurance coverage for hospital care), Part B (outpatient medical insurance), and Medicaid (health insurance for low-income patients), does not involve direct payments by the federal government on a per-service or per-drug basis. Instead, private entities, known as Part D Plan Sponsors, contract with the CMS, the component of the Department of Health and Human Services charged with the administration and operation of the Medicare and Medicaid programs, to provide prescription drug coverage to subscribers under a joint publicly-funded, privately-operated model. 42 U.S.C. § 1395w-11(b); 42 C.F.R. § 423.265.

Even drastically simplified for purposes of overview, the operation of this model is considerably complex, involving: (1) an up-front estimate from the plan sponsor of its cost to provide a typical Part D enrollee (a beneficiary) with basic coverage on a monthly basis after

subtracting expected cost-sharing payments by enrollees and government catastrophic and low-income subsidies; (2) periodic payments by CMS to the plan sponsor; and (3) a data-intensive reconciliation process by which the actual cost of services is compared with the estimate, resulting in either a return of funds to CMS or supplementary payments from CMS to the Plan Sponsor. *See United States ex rel. Spey v. CVS Caremark Corp.*, 875 F.3d 746, 749 (3d Cir. 2017) (describing overall operation of Part D); *see also* 42 C.F.R. §§ 423.265, 423.279, 423.293, 423.505.  To facilitate these payment and reconciliation processes, CMS has imposed various reporting requirements on the Part D Plan Sponsors, including one that is central to the allegations in this case: a report regarding "Direct and Indirect Remuneration" ("DIR") received by the Part D Plan sponsor. *Id.*

The core allegation in Relator's complaints (again, simplified for present purposes) is that the manufacturers and PBMs caused these Part D Plan Sponsors to submit false or inaccurate DIR reports to CMS because the service or administrative fees paid by drug manufacturers to PBMs were not commensurate with fair market value.  Relator further contends that these service and administrative fees are based on a percentage tied to drug price, and escalate with that price, in a manner that is unrelated to the value of the services provided, and that this practice is based on collusive agreements among various players in the Part D marketplace. *See* Amd. Compl. at ¶ 27-112.  Indeed, the operative complaints in this and the S.D.N.Y. case allege widespread, and in many cases collusive, fraud among virtually all of the major players in the Medicare Part D drug coverage, ranging from drug manufacturers to pharmacy benefit managers to Part D insurance plans.  Litigating this allegation alone will involve inquiry into a wide array of contractual, billing, reporting, and analytical material by means of potentially vast and intrusive discovery that will impact both the United States and third parties.

14

Equally if not more importantly with respect to the Government's burden analysis, litigating virtually any aspect of Relator's theories will almost certainly involve third-party discovery requests to the relevant components of CMS, addressing policy issues, regulatory evolution, and actual data compiled and received by the agency.   Even assuming that some of the many defendants collaborate to consolidate or streamline discovery requests, multiple, overlapping and burdensome requests for documents and testimony are inevitable.   Responding to such requests will impose a significant burden on two United States Attorney's Offices, components of the Department of Justice in Washington, and, most importantly, on components of CMS, requiring that CMS officials devote attention to discovery matters at the expense of actual administration of parts of the Medicare program.   While these concerns might weigh considerably less in the Government's favor in a case that the United States believed merited its direct prosecution, they are overwhelming in a context, such as the FCA, where it is the Government's interest alone that is to be vindicated, and the Government has chosen not to proceed.   Simply put, if the United States does not believe that it is in the public interest to pursue this lawsuit, it should not be put to the burden of superintending and responding to extensive discovery post declination.

**b. The burden of monitoring these actions cannot be justified where the United States has determined that Relator's allegations remain unsupported.**

The Government's determination that it can better expend limited resources on other cases and matters is exacerbated here because Relator lacks insider information and the Government's investigation concluded that many aspects of his allegations are unsupported. In this case, two United States Attorney's Offices, in conjunction with the Department's Civil Frauds section, issued multiple subpoenas and Civil Investigative Demands to a broad array of defendants, including pharmaceutical manufacturers, PBMs, Part D Plan Sponsors, as well as to other third parties.   The Government reviewed and analyzed tens of thousands of responsive documents

touching on all aspects of Part D fee negotiation, structure, handling, and reporting.  It conducted dozens of interviews and took sworn testimony pursuant to Civil Investigative Demands.  Based on these extensive, multi-year investigative efforts, the Government concluded that many of Relator's core contentions, including the manner in which these fees are collected, reported, or distributed, and their resulting impact on the bidding and reconciliation process, are unsupported or incorrect, and unlikely to result in a recovery.

While the Government conducted a wide-ranging and extensive inquiry, the investigation could not, and did not, touch upon every aspect of the Relator's sprawling complaint. Nevertheless, given the extent of the investigation and the judgments it has reached, the Government has a particularized and substantial interest in avoiding the burden of participating in discovery, monitoring the case, and, if necessary, filing statements of interest on legal questions that implicate broader governmental concerns.  In this regard, it bears emphasis that the United States does not take the position that fraud, misrepresentation, or falsity in connection with Part D reporting, including with respect to *bona fide* service or other fees, could never give rise to False Claims Act liability.  To the contrary, the Government's interest in preserving its ability to pursue factually supported and legally viable claims in the future heightens its interest in disposing of cases that it concludes lack merit, lest the lack of viability in those cases results in adverse legal developments that could impair future enforcement efforts.

### c.   Relator's actions further lead the Government to believe that he should not represent what remain governmental interests in litigation.

Finally, two aspects of Relator's conduct provide an additional basis for the Government's decision.  First, despite repeated requests to consolidate what are essentially two duplicative cases, Relator has refused to consent to the transfer or dismissal of one of the two lawsuits he has filed in Rhode Island or the Southern District of New York.  Even at this stage, this refusal has required

duplicative briefing and will now burden the judicial resources of two United States District Courts to adjudicate multiple, complex motions to dismiss.  Apart from the hope that two cases will afford the Relator two bites at the proverbial apple in pursuit of his claims, there is no rational reason, and certainly not a rational reason that benefits the United States, for Relator to maintain two duplicative, overlapping suits.   If Relator rebuffs the United States' request on such a straightforward procedural matter, the Government has scant confidence that he will serve the sole interests that the FCA exists to vindicate: those of the United States, rather than his own.

On this point, it has also come to the Government's attention, since declination, that Relator has been accused by his former employer with having engaged in abusive securities trading relating to his *qui tam* suits.  This includes the allegation that he took short positions in the stock of one or more defendants, and then made public statements about his allegations and the unsealing of these cases in a manner designed to impact the price of various defendants' stock.  *See Borzilleri v. Shepherd Kaplan Krochuk, LLC*, No. 18 Civ. 4654 (RJS) (S.D.N.Y.) (the "SKK Litigation").[10] Indeed, in the SKK Litigation, Relator, in his own words, "admits making short trades in the securities of defendants [in what he describes as the 'Pharmaceutical Conspiracy Lawsuits']," and admits that, after he was supposedly told by the Department of Justice that his allegations were not based on inside information, he "began shorting the equities of some of the related stocks driven

---

[10] The SKK Litigation pertains to Relator's termination from the financial firm and an investment fund with which he was previously associated, based at least in part on his alleged trading activity relative to the two *qui tam* suits. The Court may take judicial notice of these filings in another federal District Court. *See, e.g. Kowalski v. Gagne*, 914 F.2d 299, 305 (1st Cir. 1990) ("federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand"); *Bluetarp Financial, Inc. v. Matrix Construction Co., Inc.,* 709 F.3d 72, 78 n.4 (1st Cir. 2013) (taking judicial notice of related state court cases); *Ezra Charitable Trust v. Tyco Intern., Ltd.*, 466 F.3d 1, 9 n.7 (1st Cir. 2006) (endorsing "judicial notice of . . . SEC . . . complaint . . . subsequent consent decree, and . . . final judgment" filed in district court).

by his proprietary research, due to his fiduciary obligation to the investors in [a] fund" that he managed. *See* Exhibit A (Excerpts from Answer to Counterclaim by John R. Borzilleri, SKK Litigation Docket No. 16-3 at ¶¶ 31, 32). The SKK Litigation also reveals that, in April of 2018, shortly after these cases were unsealed, Relator issued an email advisory to dozens of news outlets and financial analysts describing his allegations, including making lurid (and, based on the government's investigation) unsubstantiated claims that "[m]any vulnerable patients have lost their lives," as a result of the scheme he alleges in his *qui tam* suits. *See* Exhibit B (Motion for Stay, Ex. B, SKK Litigation Docket No. 16-2); Exhibit A at ¶¶ 38-43.

The United States emphasizes that it has made no finding with respect to Relator's securities trading conduct, nor has it concluded that any violation of the applicable securities laws took place. That inquiry is neither required by, nor conclusive on, its decision to dismiss here. Sufficient allegations have been raised, however, that Relator used the filing or unsealing of his *qui tam* complaints to engage in, or further, at least some trading activity for his own or his former investment funds' benefit, and the Government considers his answers to direct questions on this topic to be evasive. While the FCA provides a financial incentive for relators in the form of a share of the Government's recovery in litigation, it is not intended to be used as a lever to further private financial dealings by a whistleblower. In this case, the Government finds these allegations sufficiently concerning that, combined with the other factors discussed above, it does not believe Relator should proceed as the representative of its interests in litigation. In this case, the Government believes that any of these rationales (particularly the resource burden), standing alone, satisfies the *Sequoia Orange* rationality test, but that considered together, they provide a clear and rational basis for dismissal.

## CONCLUSION

While the United States does not take lightly the exercise of its inherent dismissal authority under 31 U.S.C. § 3730(c)(2)(A), for the reasons discussed above, it has determined that this authority should be invoked here, and in consequence we ask that the Court order the case dismissed.

Dated: Providence, Rhode Island
        December 21, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General, Civil Division

STEPHEN G. DAMBRUCH
United States Attorney

By: _/s/ Zachary A. Cunha_____
    ZACHARY A. CUNHA (Bar No. 7855)
    Assistant U.S. Attorney
    50 Kennedy Plaza, 8th Floor
    Providence, Rhode Island 02903
    (401) 709-5000
    (401) 709-5001 fax
    Email: Zachary.Cunha@usdoj.gov


MICHAEL GRANSTON, Director
ANDY MAO, Assistant Director
SANJAY M. BHAMBHANI, Senior Trial Counsel
Civil Division, Fraud Section
United States Department of Justice
Ben Franklin Station, PO Box 261
Washington, D.C. 20044
Telephone: (202) 305-0546

*Counsel for the United States*

19

## <u>CERTFICATE OF SERVICE</u>

I hereby certify that, on December 21, 2018, I caused the foregoing document to be filed by means of this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rules of Civil Procedure 5(b)(2)(E) and 5(b)(3) and Local Rules Gen 304 and 305.

Dated:  December 21, 2018                By:    _/s/ Zachary A. Cunha_____
                                               Zachary A. Cunha
                                               Assistant United States Attorney